**LUCKENBACH S. S. CO., Inc., et al. v. BUZYNSKI.\***

Circuit Court of Appeals, Fifth Circuit.
June 2, 1927.

No. 4786.

**I. Shipping ⊕=84(3½)—Insufficiency of mousing held not proximate cause of accident in loading ship from falling of chain sling, when blocks on derrick were pinned on starting of winch.**

Any insufficiency of mousing, which was of the ordinary kind, on hook of lower block of fall with which loading derrick on ship was equipped, was not proximate cause of accident to longshoreman engaged in loading ship, from falling of chain sling when the blocks jammed on the unexpected starting of the steam winch; a mousing not being intended to support any weight.

**2. Shipping ⊕=84(3½)—Use of shackle, instead of hook, on block of fall of derrick, held not required in exercise of reasonable care.**

Though, if lower block of fall with which derrick on ship was equipped had been fitted with a shackle, instead of a hook, accident from fall on longshoreman of chain sling, when the blocks were jammed on the unexpected starting of the steam winch would not have happened, the accident was not such as should have been reasonably anticipated, so as to require the use of a shackle in the exercise of reasonable care.

**3. Shipping ⊕=84(3½)—Duty of shipowner to longshoreman employee of loading contractor, as to working appliances before and after they are turned over to contractor, stated.**

Though longshoreman, loading ship, be employee of independent contractor, shipowner

\*Rehearing denied July 18, 1927.

owes him the duty of using reasonable care to furnish reasonably safe appliances to work with, and of inspecting them before turning them over to the contractor; but, to be charged with liability to him because of defects in the appliances arising through use while in the contractor's charge, the shipowner must have had notice of their becoming defective.

**4. Master and servant ⚌120—Contractor for loading ship, in exercise of care to provide longshoreman safe appliances, may rely somewhat on shipowner's duty as to appliances.**

Contractor for loading ship owes to its employee longshoreman engaged in the work the absolute and nondelegable duty of reasonable care to provide him a reasonably safe place to work and reasonably safe appliances with which to do the work, but in the exercise of such care is entitled to rely to some extent on the duty of the shipowner to initially furnish safe appliances.

**5. Master and servant ⚌120—Steam winch working derrick on ship, though not fitted with pin to hold lever, held reasonably safe.**

Within rule that an employer is not obliged to supply the newest and best appliances, but may use such as are in common use and reasonably safe and proper for doing the work, steam winch by which derrick on ship was worked, though not fitted with pin to hold lever and prevent winch starting when not in use, *held* reasonably safe, since, if check valve was cut off, as it should be, it would be safe.

**6. Master and servant ⚌265(5)—Shipping ⚌86(2⅜)—Accident to employee of contractor for loading ship is not proof of negligence of employer or shipowner.**

That an accident happened to a longshoreman employee of contractor for loading ship while engaged in the work is not proof of negligence, but he must show with reasonable certainty that he was injured through the negligence or breach of duty of the employer or shipowner, or both.

**7. Master and servant ⚌278(3)—Shipping ⚌86(2¾)—Longshoreman, injured by fall of chain from derrick while loading vessel, held not to have proved negligence of employer or shipowner.**

In suit against shipowner and contractor for loading it, for injury to longshoreman while at the work as employee of the contractor, by fall of chain sling from derrick on the unexplained starting of the steam winch, *held*, that there was a failure to prove negligence or breach of duty of either respondent.

Appeal from the District Court of the United States for the Southern District of Texas; Joseph C. Hutcheson, Jr., Judge.

Libel by Karl Buzynski against the Luckenbach Steamship Company, Inc., the Texas Contracting Company, and another. From a judgment for libelant against the named defendants (12 F.[2d] 92), they appeal. Reversed.

J. Newton Rayzor, of Houston, Tex. (Lockhart, Hughes, Lockhart & Rayzor, of Galveston, Tex., on the brief), for appellants.

W. E. Price, of Galveston, Tex. (D. B. MacInerney, of Galveston, Tex., on the brief), for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. Appellee, Karl Buzynski, filed a libel against the Luckenbach Steamship Company, hereafter called the Steamship Company, owner of the steamship Edgar F. Luckenbach, against William Parr & Co., agents of the Steamship Company, and against the Texas Contracting Company, contracting stevedores, hereafter called the Contracting Company, to recover damages for personal injuries suffered while working as a longshoreman on the said ship in the port of Galveston.

Buzynski was employed by the Contracting Company, an independent contractor engaged in loading the ship. The ship's winches were used, the Contracting Company supplying the winchman. On the morning of October 25, 1924, just after he had started to work, and while he was engaged with a number of other men in removing the hatch covers from No. 3 hatch on the said ship, without warning, a chain sling, or bridle, weighing about 40 pounds, fell from aloft and struck and injured him.

The libel alleged in general terms that respondents were negligent in not providing libelant with a safe place to work and safe equipment to work with, and in failing to keep the same in reasonably safe condition, without specifying wherein the premises were unsafe or the appliances defective. On the trial of the case it developed that the chain which injured libelant fell from the end of the boom of a derrick at No. 3 hatch. The derrick was equipped with a fall rigged with an upper and a lower block. In some way, not shown by direct evidence, the winch to which this fall was connected was put in motion, the blocks jammed at the end of the boom, the lower block upset, the chain came against the mousing of a hook from which it was suspended, the mousing gave way, and the chain dropped.

Libelant contended that the winch was defective, because not fitted with a pin to hold the control lever of the winch in neutral, that the mousing was insufficient and defective, and that the lower block should have been fitted with a shackle, instead of a hook.

The District Court found that the mousing was insufficient, but that this was not the

proximate cause of the accident; found that the winch was put in motion because of steam leaking into the cylinders, causing it to start up when no one was in attendance; and held that it was defective in not being fitted with a pin to hold the lever in position. The libel was dismissed as to Wm. Parr & Co., and judgment was entered in solido against the other two respondents in the sum of $12,500, less some $720, paid by the Construction Company to libelant under the provisions of the Texas Workmen's Compensation Law (Vernon's Ann. Civ. St. 1925, arts. 8306–8309).

[1, 2] We agree with the District Court that the mousing was not the proximate cause of the accident. It is shown without dispute that it was the usual mousing and was put on by the foreman of the Contracting Company under the supervision of the mate of the vessel. A mousing is not intended to support any weight. Its purpose is to keep the sling from slipping out of the hook when the tackle is slacked off to release the load after it has landed, and, while it is true that if the block had been fitted with a shackle, instead of a hook, the accident would not have occurred, unless some part of the tackle gave way, for the purpose of doing the work at hand the hook was sufficiently strong and safe. The accident was not such as should have been reasonably anticipated, so as to require the use of a shackle in the exercise of reasonable care.

[3] As libelant was an employee of an independent contractor, the relationship of master and servant did not exist between him and the steamship company. However, it owed him the duty of using reasonable care to furnish him with reasonably safe appliances to work with, suitable to the work being done, and of inspecting these appliances before turning them over to the Contracting Company. If thereafter the appliances became defective through use while in charge of the Contracting Company, it was necessary for notice of that fact to be brought home to the Steamship Company to impress it with liability. Navigazione Alta Italia v. Vale (C. C. A.) 221 F. 413.

[4] On the other hand, the relationship of master and servant did exist as between libelant and the Contracting Company, and they owed him the absolute and nondelegable duty of using reasonable care to provide him with a reasonably safe place to work and reasonably safe appliances to do the work with; but in the exercise of this degree of care the Contracting Company was entitled to rely to some extent upon the duty of the Steamship Company to initially furnish safe appliances. Labatt's Master and Servant, pars. 1055 to 1065.

The winch which caused the accident is described as a typical twin cylinder single drum controlled gear winch. It is operated by a vertical throttle valve, controlled by a lever about 6 feet long, hinged to a fulcrum about 2 feet from the operating valve. The lever is horizontal in neutral, and moves up and down between guides fitted on one inner side with cogs about three-sixteenths of an inch deep, which engage corresponding cogs on the lever. Slight pressure from the winchman will cause these cogs to mesh, so that the lever is held in position, unless moved by hand or jarred in some way. The steam for operating the winch comes from a pipe line on deck leading to the boilers, which is closed by a check valve so placed that the man operating the lever can at the same time open or close the valve. When this check valve is closed, no steam can be admitted to either the operating valve or the cylinders of the winch, and it cannot operate no matter what position the lever may be in.

There is evidence tending to show that the lever may be thrown out of position by a jarring of the ship, causing the drum of the winch to revolve, if steam is on. Some of the evidence tends to show that, if the lever is jarred out of position, it will fall, in which event the tackle would have been slacked off and the accident would not have happened; but there is also evidence that it might go either up or down. It is shown that the winch in question is of standard construction and of the kind used on many steamships; but it is also shown that some winches of the same type have a pin which may be put through corresponding holes in the lever and guides to hold the lever in position.

[5] It is elementary that an employer is not obliged to supply the newest and best appliances, but is justified in using such appliances as are in common use and are reasonably safe and proper for doing the work. Measured by this standard, it would appear that the winch in question was reasonably safe. It did not develop any defect when in operation, and no accident occurred while it was being used for the work. It became a dangerous factor in a most extraordinary accident, when left at rest and unattended. If the check valve was cut off, as it should have been when the winch was not in use, it would be just as safe as if the lever were secured by a pin, provided the winch was otherwise in good condition, and it could hardly be said that the addition of a pin would add any factor of safety, considering the ever-present human equation, as the operator might as well have forgotten to put the pin in place as to cut off the valve.

The testimony shows without contradiction that it was the custom on the ship to overhaul the winches on every trip after leaving port, and, regarding this particular winch, that it had been taken apart and thoroughly inspected and the valves measured to determine the amount of wear before the ship arrived at Galveston. The winch had been in operation for at least a day and a night, and no complaint had been made by any one as to its condition. Immediately after the accident it operated without any repairs having been made.

[6] The fact that an accident happens is not proof of negligence, and it was incumbent upon libelant to show with reasonable certainty that he was injured through the negligence or breach of duty of one or both of respondents. Patton v. Texas & P. R. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361.

[7] In this case, if the winch had failed during the work, causing the sling to fall, that would have been prima facie evidence that it was defective, but not necessarily of negligence, considering the difference in the measure of responsibility of the respondents. There was no evidence to show what put the winch in motion. It was not shown that there was any jarring of the ship, or that any one touched the winch. No one noticed the winch in motion, and no one was aware of any impending danger, until the accident happened. It is certain that, if the stop valve was closed and in good order, the accident could not have occurred, whether the lever was moved or not. It is also reasonably certain that, if the lever was properly left in neutral and the cogs meshed, it would not move, unless jarred out of place or moved by hand.

Any theory as to what caused the movement of the winch is largely conjecture. The evidence in the record is hardly sufficient to show that the winch was leaking enough to make it dangerous. There is a general statement from several witnesses that it was leaking steam when in use, but nothing to show that the check valve was defective or leaking, or that the winch showed any evidence of leaking in between shifts of workmen when standing idle, and there is direct evidence from one witness that the check valve showed no signs of leaking. Furthermore, the evidence is conflicting as to whether it was possible for the winch to operate because of leaking steam; some witnesses testifying that the steam would leak equally into both cylinders, without any effect upon the movement of the machine, and others giving an opinion to the contrary. But even on this theory it would be necessary to show that the winch was defective when turn-ed over to the longshoremen, or that the ship had notice that it had become defective in use, in order to hold the Steamship Company.

Berg, the winchman who operated the winch the night before the accident, and who left it about 10 o'clock, testified that he put the lever in neutral and left it there. His testimony is contradictory as to whether he closed the stop valve. He made a statement shortly after the accident to a representative of an insurance company that he had closed it, but in his testimony at the trial he stated that he did not remember whether he closed it or not. He denied that he touched the winch on the morning of the accident, and denied that there was any rule requiring him to close the stop valve when quitting work, or that he was instructed to do so. On the other hand, there is evidence from his foreman that it was the general rule that winchmen should always close off the steam from the feed pipe when quitting work, and that this man had been so instructed. As this conforms to common sense and prudence, it perhaps ought to prevail.

It is further shown that steam is cut off at the boilers from the winches immediately after the longshoremen stop work, and it is turned on again about 30 minutes before they resume; that it is customary for the winchmen on going aboard to operate the winches for a while in order to warm them up and get ready for the day's work. When the gang quit work the night before the accident, the sling was left hanging about 6 feet above the hatch. When the men resumed work in the morning, it might have been considered in the way of removing the hatch covers, and the winch might have been operated to raise it.

By the evidence just referred to the very reasonable hypotheses might be supported: First, that Berg forgot to close off the stop valve on quitting work, and that as the steam was turned on in the morning it entered the throttle or operating valve, and the lever was shifted by some one carelessly knocking against it; second, that some one, either the winchman or another longshoreman, started up the winch to raise the sling out of the way, and carelessly allowed the blocks to jam; third, that the winchman started to warm up the winch, and thoughtlessly turned aside to something else. On any of these theories there would be no liability of the Steamship Company, as no defect in the winch would be shown, and as between libelant and the Contracting Company the negligence would be that of a fellow servant or a third person.

On the whole case, it is evident that libelant has failed to prove negligence or breach of duty by either respondent. Where there are

two defendants, either or both of whom may be liable, it is necessary to show with reasonable certainty by a clear preponderance of the evidence in which the fault lies, perhaps more definitely than when there is but a single defendant.

It follows that the judgment appealed from must be reversed.