### GLOVER et al. v. COMPAGNIE GENERALE TRANS-ATLANTIQUE.

### No. 9031.

Circuit Court of Appeals, Fifth Circuit.

May 1, 1939.

Rehearing Denied May 25, 1939.

Brantly Harris and Geo. W. Coltzer, both of Galveston, Tex., for appellants.

J. Newton Rayzor, of Houston, Tex., for appellee.

Before FOSTER, HUTCHESON, and McCORD, Circuit Judges.

FOSTER, Circuit Judge.

J. R. Glover, a longshoreman, was killed in an accident on board the S. S. Nevada, on October 16, 1937, while the vessel was being unloaded in the port of Houston, Texas, at a dock operated by Manchester Terminal Corporation. His widow, Jessie Glover, brought this suit at law against the Compagnie Generale Transatlantique, a French corporation, usually referred to as the French Line, owner of the vessel, to recover damages for his death, for the benefit of herself and two minor children. At the close of the evidence a verdict was directed in favor of defendant. Error is assigned to that action of the court.

There is undisputed evidence in the record tending to show the following facts. Glover was an employee of National Stevedoring Co., which company had a contract to load and discharge cargo from French Line steamers and another contract with the Terminal Company to load certain classes of cargo on railroad cars on the wharf. The work of discharging cargo began on the afternoon of October 15, 1937, and proceeded without complaint at any time as to the equipment furnished by the ship. At the time the accident occurred, about 9:30 on the morning of October 16, 1937, Glover had been called from the hold where he was working and acting as a winchman at No. 4 hold, on the after part of the vessel. The apron of the wharf was about 30 feet wide and a railroad track ran along it, about four feet from the outer edge. The cargo being unloaded at the time was steel rods used to reinforce concrete construction. The rods were mostly forty feet long but some were shorter. The method of discharging was as follows. A sling load of rods weighing about 4,000 pounds was raised from the hold by two other winches at the hatch, operating together, so that one end rested on the deck of the vessel and the other end on a gondola car, spotted on the track alongside. Tackle from the winch Glover was operating was then made fast to one end of the load and it was raised up and straightened out in the car. The fall used on the derrick and winch Glover was operating was a steel wire hoisting rope about three-fourths of an inch in diameter and about 150 feet long. About 70 feet of the rope was necessary to be used in loading the car. The surplus rope was wound around the drum of the winch.

This particular fall was also used for moving the cars into position. Just prior to the accident most of the fall had been run off the drum but was not long enough to reach the next car to be spotted. Two or three cotton slings were fastened together to be attached to the end of the car to lengthen the fall so that the winch could be used to draw the car in place. While this was being done Glover decided to "cross the fall," a term used in stevedoring, meaning that one layer of the rope on the drum would be put across and on top of another so that the strain would jamb it against the drum, making the winch more safe to operate. It is customary to "cross the fall," without regard to how the end of the rope is secured to the drum. Glover was standing facing the winch. His right hand was close to the lever used to start the drum and close to the valve controlling the steam in the cylinders of the winch. He was wearing a working jacket and gloves. He started the drum forward very slowly. While he was endeavoring to "cross the fall," the winch suddenly started up rapidly and in some way he was drawn into the coils on the drum and so badly injured that he died on the way to a hospital.

The negligence alleged and relied upon by plaintiff is this. That the wire rope used for the fall was old and "spiders," small pieces of wire, were sticking from it; that when Glover endeavored to "cross the fall" these caught in his glove or in the sleeve of his jacket and pulled him into the winch; that the end of the fall was not properly fastened to the drum; and that if it had been, there would have been no necessity to "cross the fall." Defendant denied liability and pleaded contributory negligence.

The District Court concluded that at the time of the accident Glover's employer was not unloading the ship but was engaged under a separate contract in loading the car and the vessel was under no obligation to furnish the appliances. Therefore, defendant was not responsible for the accident. On this point a close question of fact and law is presented. However, in view of other features of the case we pass it without discussion or decision.

The evidence of the chief officer of the vessel is that the wire rope used for the fall was new and had been rigged while the vessel was at sea, two days before the work of discharging began. It had an eye spliced in the end and this was made fast to an eyebolt of the drum with a rope about one-half inch in diameter. And that this was a proper way of securing the rope to the drum. The evidence of the first assistant engineer is that the winch was inspected the morning of the accident about an hour before the man went to work and was in perfect condition. As against this there was evidence from longshoremen at work on the ship to the effect that the end of the fall was fastened to the drum with a piece of spun yarn; that it should have been fastened with a shackle; that the wire rope was black and greasy and looked old. These same witnesses testified the "spiders" could not be detected except by very close inspection and they made no examination of the rope except by looking at it. There was undisputed evidence tending to show that a new wire hoisting rope is always greased to make it more flexible; that it looks black shortly after being put in use; and that "spiders" may develop on new rope. There was no evidence at all to show why the winch started up at full speed. No one but the deceased was near it when this happened.

 A vessel owes the duty to a longshoreman employed by an independent contractor of using reasonable care to furnish him reasonably safe appliances to work with in handling cargo of the ship. In order to recover it was incumbent upon plaintiff to show breach of this duty. Luckenbach S. S. Co. v. Buzynski, 5 Cir., 19 F.2d 871; Navigazione Alta Italia v. Vale, 5 Cir., 221 F. 413.

 It is certain the hoisting rope did not break and did not part from the drum. Neither the use of the fall for spotting cars nor the age or strength of the rope nor the method of securing it to the drum was the proximate cause of the accident. The theory of plaintiff is that a defective condition of the rope, in that "spiders" were sticking from it, caused the accident, by these "spiders" catching in Glover's jacket or gloves and drawing him into the winch. Except for a presumption that would have to be predicated solely upon the torn condition of Glover's jacket, there was nothing to support this theory. Of equal force would be the presumption that the jacket was torn after Glover's arm was caught under one of the coils on the drum. It is reasonably certain that "spiders" could not be prevented by reasonable care in inspecting the rope. And even more

certain that had the winch not suddenly started up at full speed, the accident would not have happened. We consider that plaintiff has failed to prove the proximate cause of the accident or that it resulted from negligence or breach of duty by defendant. The evidence did not require the case to be submitted to the jury. Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 53 S.Ct. 391, 77 L.Ed. 819.

Affirmed.