## UNITED STATES v. JOHNSON.
## JOHNSON v. UNITED STATES.
### No. 11378.

Circuit Court of Appeals, Ninth Circuit.

March 24, 1947.

James M. Carter, U. S. Atty., Ronald Walker and Robert E. Wright, Assts. to U. S. Atty., Harold A. Black, George E. Toner and McCutchen, Thomas, Matthew, Griffiths & Greene, all of Los Angeles, Cal., for appellant United States.

David A. Fall, of San Pedro, Cal., for appellant Johnson.

Before MATHEWS, STEPHENS, and ORR, Circuit Judges.

ORR, Circuit Judge.

Robert C. Johnson, appellee, a seaman on the S. S. "Mission Soledad", a vessel owned and operated by appellant through the War Shipping Administration, was injured on June 30, 1944 while performing duties aboard his ship at Pearl Harbor.

Appellee was assisting in securing a boom and, at the time he was injured, was engaged in an operation known as "rounding in" blocks to bring two blocks of a block and tackle together. Appellee was on the main deck walking forward pulling on the hauling or "free" end of a rope (which was attached to the block) while a shipmate, one Dudder, on the mecanno deck above and to the rear of appellee, held the block in his hands. Appellee would pull on the rope and coil the free part of the line thus accumulated while Dudder, holding the block, walked forward on the meccano deck at a rate of speed controlled by appellee. The ropes had to be kept comparatively taut so that they would not foul. At all times before the accident appellee had been able to pull freely on the line he was coiling and Dudder had not pulled back on the block or jerked appellee's rope. The last thing appellee remembers before the accident is that he was bending over coiling the line on the deck.

It is stipulated that a "block, which was being removed by a man working above libellant (appellee) fell, striking libellant on the back of the head. Libellant alleges that this accident was due to the negligence of the ship and respondent (appellant) denies that such injuries were caused by any negligence of the ship".

An initial report of the accident on a form filled out by the purser of the vessel indicated that the "guy block was caught on a davit, one of the men cast it off and line and block fell free striking this sailor on the back of the head * * *."

While this report was marked for identification, it does not appear that it was ever formally admitted in evidence.

Appellant states that they located Dudder and arranged for his deposition to be taken and made available the transcript to appellee. Appellee did not offer this deposition, his counsel stating in argument that he was not satisfied with certain parts of it and because "there is no burden on the libellant to bring in adverse witnesses".

Appellant also failed to offer it because, as their counsel stated, they felt it incumbent upon appellee to prove negligence.

The trial court found that appellee had been injured by the block which "was negligently and carelessly dropped by a fellow seaman". In an oral opinion the court ruled that the evidence showed both negligence and a case for the application of the doctrine of res ipsa loquitur, and, on the basis of the liability so found, the court awarded damages for anticipated loss of wages, and for pain and suffering.

■ The case was tried before Judge Hollzer who died after its submission but before deciding the matter. The cause was then submitted on stipulation to another District Judge who decided the matter on the written record and oral argument and without the usual opportunity of a trial judge to see and hear the witnesses. For that reason, and because this is an appeal in admiralty, the findings of the trial court do not come to us encased in their usual armor.[1]

Appellant contends, (1) that there is no evidence to support the District Judge's finding of negligence, and (2) that the doctrine of res ipsa loquitur is not here available as a substitute for proof of negligence.

■ We think both of these contentions are well taken. As to the first, the only testimony on the subject of negligence is the evidence of appellee who stated that Dudder was carrying the block and walking forward on the meccano deck above, as appellee would pull on the rope. Appellee's evidence does not confirm the unsupported statement in the purser's later report of the accident, and appellee's evidence is at variance with the pre-trial stipulation, since appellee's testimony showed that Dudder was not directly "above libellant" but was diagonally above him and to his rear. Further, Dudder was not "removing a block" but was assisting appellee in "rounding in", i. e., carrying the block forward as appellee pulled free lengths of the line attached to the block, and coiled the line thus accumulated.

There is no competent evidence that Dudder *dropped* the block or was otherwise negligent in any way. There is, in fact, no evidence as to Dudder's activities, appellee having chosen not to use Dudder's deposition, although he is resting his case, so far as negligence is concerned, entirely on the negligence of a fellow-servant. This gap in appellee's case is thus necessarily fatal to his contention.

■ The closest approach to the time of the accident to which the evidence points is the time appellee was coiling the rope. He has no memory of subsequent events and no competent evidence appears as to just what did occur. The finding of the lower court that appellant was negligent finds no support in the record. The mere occurrence of an accident does not warrant a finding of negligence.[2]

Appellee argues that in the event it is found appellant was not negligent then he is entitled to recover under the doctrine of res ipsa loquitur.

■ It is generally said that before the doctrine of res ipsa loquitur will apply it must be shown that "a thing which causes injury, without fault of the injured person, is * * * under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care * * *."[3]

It is also said that the doctrine is not applicable unless "by a process of probable reasoning, the facts and circumstances point out the wrongdoer, the tortious character of his act, and exclude other probable causes of the injury".[4]

■ And when these things are shown, the doctrine "affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care".[5] " * * * that is to say, if there is nothing to explain or rebut the inference that arises from the way in which the thing happened, it may fairly be found to have been occasioned by negligence".[6]

The Supreme Court in Jesionowski v. Boston & Maine Ry., 67 S.Ct. 401, laid down the rule that courts are not to apply a "conceptualistic interpretation" of res ipsa

---

[1] Cf. The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 501; certiorari denied 299 U. S. 600, 57 S.Ct. 193, 81 L.Ed. 442.

[2] Atchison T. & S. F. R. Co. v. Toops, 281 U.S. 351, 50 S.Ct. 281, 74 L.Ed. 896; The Tawmie, 5 Cir., 80 F.2d 792; Interstate Circuit v. LeNormand, 5 Cir., 100 F.2d 160.

[3] San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 98, 99, 32 S.Ct.

399, 401, 56 L.Ed. 680; Liggett & Myers T. Co. v. DeLape, 9 Cir., 109 F.2d 598, 601.

[4] Smith v. United States, 5 Cir., 96. F.2d 976, 978.

[5] San Juan Light & Transit Co. v. Requena, supra, note 3.

[6] Sweeney v. Erving, 228 U.S. 233, 238, 239, 33 S.Ct. 416, 418, 57 L.Ed. 815, Ann. Cas.1914D, 905.

loquitur, and that an examination of the facts and circumstances of a particular case should be made. The Supreme Court said: "The question here really is * * * whether the circumstances were such as to justify a finding that this derailment was a result of the defendant's negligence." Jesionowski v. Boston & Maine Ry., supra, 67 S.Ct. at page 404.

We think the circumstances of this case are not "such as to justify a finding that this [accident] was a result of [appellant's] negligence."

Appellee was pulling on a line attached to a block being carried by Dudder. In some manner, unexplained by appellee, and not revealed by the evidence, the block fell and hit appellee. Appellee contends that because he was coiling the line "just before the accident", he has negatived any possibility that he *pulled* the block from Dudder's hands[7] and so caused his own injury.

Appellee testified that he was coiling the line and that was the "last thing [I] knew before the accident * * * I was bending over. That is all I remember".

The last act remembered by appellee of coiling the rope is not a fact from which we can *infer* that Dudder dropped the block, rather than having it pulled out of his hands by appellee. This becomes more evident when it is remembered that in many concussion cases lapse of memory antedates the actual injury by short periods of time. The first diagnosis of appellee's injury was a probable mild concussion.

It must also be borne in mind that the block and tackle on which appellee and Dudder were working is designed for the "purpose of multiplying force",[8] and that whatever the force of appellee's pull on the rope that pull was multiplied at Dudder's end of the block by at least three to four times the force exerted by appellee, since there were four lines of rope between the blocks. Thus, if appellee pulled on the free end of the rope with a 25-pound pull, Dudder's end of the block would come along with a pull of at least 71.4 pounds.[9]

Under these circumstances, with the actual cause of the accident totally unexplained, we cannot say that the "facts of the occurrence warrant the inference of negligence", (Sweeney v. Erving, supra, note 6, page 240 of 228 U.S., page 418 of 33 S.Ct., 57 L.Ed. 815, Ann.Cas.1914D, 905) or "[that] the circumstances were such as to justify a finding" that the accident was the result of appellant's negligence. Jesionowski v. Boston & Maine Ry., supra.

There is no presumption of negligence from mere proof of the accident (Sweeney v. Erving, supra, note 6, page 238 of 228 U.S., 33 S.Ct. 416, 57 L.Ed. 815, Ann.Cas. 1914D, 905. Smith v. United States, supra, note 4) and this is not a case where the "circumstances of the occurrence that has caused the injury are of a character to give ground for a reasonable inference that if due care had been employed by the party charged with care in the premises, the thing that happened amiss would not have happened." Sweeney v. Erving, supra, note 6, page 238 of 228 U.S., page 417 of 33 S.Ct., 57 L.Ed. 815, Ann.Cas.1914D, 905.[10]

Prunty v. Allred, 73 Cal.App.2d 67, 165 P. 2d 1935, relied on by appellee, was a case where the facts did warrant the inference of negligence since in that case there was evidence that the driver of the bus was responsible for the accident when he "returned rather suddenly" to his own lane of traffic after passing another vehicle.

In Leet v. Union Pacific Co., 25 Cal.2d 605, 155 P.2d 42, 158 A.L.R. 1008, certiorari denied 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1986, also cited by appellee, it was admitted by defendant railway that the case would be a proper one for the application of res ipsa loquitur, but it was argued that

---

[7] The argument is that as he had a free length of line in his hand and was coiling it, it was not necessary for him to *pull* the line again before the accident and that therefore Dudder must have dropped the block.

[8] Knight, Modern Seamanship, 10th Ed. p. 108.

[9] Knight, Modern Seamanship, 10th Ed. p. 109.

[10] Cf. Buzynski v. Luckenbach S. S. Co., 5 Cir., 19 F.2d 871; Id., 5 Cir., 31 F.2d 1015; certiorari denied 279 U.S. 867, 49 S.Ct. 483, 73 L.Ed. 1004.

the doctrine was not ,available to plaintiff because specific acts of negligence were proved. The California Supreme Court merely held that evidence, introduced by the plaintiff, of specific acts of negligence will not deprive plaintiff of the benefit of res ipsa loquitur, assuming the case is otherwise a proper one for its application. 25 Cal.2d at page 620, 155 P.2d 42, 158 A.L.R. 1008.

We do not think that the falling of a block during a "rounding in" operation is an accident which is "ordinarily the result of negligence" such as a derailment in the Jesionowski case, supra. No negligence appearing, the awards of general damages for pain and suffering and for anticipated loss of wages are disallowed.

■ The award of additional maintenance, wages to the end of the voyage, and travel allowance, is dependent upon the validity of a general release signed by appellee, which appellant sets up as a complete defense to this action. In determining the validity of the release we are aware of the careful scrutiny we are required to give a seamen's releases.

Appellee was given first aid ashore immediately after his injury and returned the same day to his ship. The next day, July 1, 1944, suffering from headache, dizziness, and nausea, appellee reported to the United States Public Health Office in Honolulu and was hospitalized until July 5, when he was discharged with (according to the clinical record) "marked improvement of all symptoms * * * not fit for duty for an indefinite period. Fit for travel".

He testified that he still felt dizzy and had headaches; that the doctors told him he would have headaches for sometime but that eventually they would pass away and that appellee was "not to be worried about them".

Appellee was paid $462.30 in Honolulu after he was discharged from the hospital, representing wages and bonus due him through July 1, 1944. He was also paid maintenance at the rate of $2 per day from July 5, to July 22, 1944. He was returned to the United States as a passenger on a vessel leaving Honolulu on July 22 and arriving in San Francisco, Sunday, July 30, 1944, with approximately $400 in his possession.

The next day appellee signed a general release. We test the validity of this release by the standard set by the Supreme Court in Garrett v. Moore-McCormack, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239: "The burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding."

On July 31, 1944, wishing to draw his wages for the month of July, appellee went to the office of Pacific Tankers, general agents for the War Shipping Administration. He was referred to the office of the attorney for the insurance underwriters and he went to that office the same day. He was not represented by counsel and had not consulted an attorney prior to this interview with the claims attorney for the insurance company. Nor had he had any medical examination or advice since he was discharged from the hospital in Honolulu other than a telephonic conversation with someone at the Marine Hospital in San Francisco the day he arrived. He reported then that his headaches were continuing, but that the Honolulu physicians had told him they would continue for a time. He was told over the telephone by someone at the Marine Hospital that if he did not feel in need of hospitalization he need not come out. He thereupon decided not to report to the hospital.

He was 25 years of age; his education included one year's study of business administration at the University of Arizona; he had worked as a metal mechanic at Consolidated Aircraft, and had had two years' service in the merchant marine.

The claims attorney to whom he was referred had been engaged in handling and adjusting maritime claims for insurance companies for 14 years. During the period he interviewed appellee he was conducting four or five similar interviews a day, five days a week.

Appellee told the attorney he was fully recovered and signed a statement to that effect.

Appellee had wages, after deductions for taxes, of $97.10 due him for July, and he was paid this sum plus $150 at the conclusion of his interview with the claims attorney and signed a general release for all claims he then had or might in the future have for damages, maintenance, cure and wages, as a result of his injury. In addition appellee was paid $15.75 repatriation bonus for his voyage from Honolulu to San Francisco.

Some conflict appears in the testimony of appellee and the claims attorney as to what the consideration was for the $150 paid appellee over and above the July wages due him.

Appellee testified it was for the bonus which he would have received had he been able to remain on the "Mission Soledad" when it proceeded from Pearl Harbor to a war zone. The claims attorney testified that appellee stated he should have something for his injury and was given $150 in settlement of such claim.

Appellee further testified that "they" would not pay him his wages until he had "signed some papers". The claims attorney denied this. It is however undisputed that the claims attorney did not inform appellee that he might have a cause of action against the operators of the vessel if he could prove negligence of a fellow servant. He told appellee that the latter was entitled, as a matter of law, to his wages from the time he left the vessel until his arrival in the United States or the end of the voyage, whichever terminated first, unless he was still disabled, in which case he could have wages during the full period of the voyage.

The attorney testified that he did not tell appellee he should have medical or legal advice because he believed appellee's statement that he was fully recovered, since appellee appeared normal in all respects.

The claims attorney had before him, during his interview with appellee, the abstract from the clinical record of hospital and outpatient service furnished appellee in Honolulu indicating appellee had been hospitalized five days and that he was "not fit for duty for an indefinite period * * *. Fit for travel". The attorney also had before him the ship's report of the accident signed by the purser indicating that appellee had been injured when one of the sailors cast off a block caught on a davit, and that this block had hit appellee.[11]

He testified that despite this report from the purser he did not tell appellee the latter had a possible cause of action against the vessel, although he stated that if he considered everything in the report absolutely accurate and ruled out contributory negligence and other defenses, he would have no doubt appellee would have had a claim against the ship. He was not sure whether or not he had even read this report to appellee. He further testified that appellee stated that he did not know how the accident had occurred.

The claims attorney also testified that he did not, during the interview, consider whether or not appellee was entitled to be furnished transportation from San Francisco back to his port of shipment, and that he had considerable doubt as to whether appellee was entitled to such transportation.

After appellee received his check for $247.10 and signed the release, he returned to his parents' home in San Diego on August 1. His headaches continued and he suffered some dizziness. He was hospitalized by the Public Health Service from August 17 to August 23, and from August 23 to October 1, 1944 he was a patient in a Seaman's Rest Center. Since October 1, 1944 he has lived with his parents, and he has received additional outpatient treatment in Public Health clinics.

---

11 This was the document, previously referred to, which was not formally admitted in evidence. The version of the accident in this report was not borne out by the evidence of appellee, but neither this fact nor the fact that the report was not received in evidence at the trial changes the fact that the claims attorney had before him a document which indicated that appellee had a possible cause of action against the ship for negligence.

A complete medical examination in January 1945 showed appellee suffering from the residual effects of brain concussion with a prognosis for full recovery in 8 to 12 months. At the trial, and after re-examination, the same physician (whose medical testimony is not challenged by appellant) revised his original estimate upward and stated that he thought full recovery would take another 12 to 16 months.

Measured by the yardstick established by the Supreme Court previously quoted from Garrett v. Moore McCormack, supra, this release cannot stand because it was not "made by the seaman with full understanding of his rights".

It is true that appellee is undoubtedly considerably more intelligent than an average seaman, but it does not appear that he was versed in medical and legal matters. He had no independent legal advice at all, and his only medical advice, given him three weeks previously, turned out to be incorrect. Seventeen days after signing the release he was hospitalized, and a medical examination six months later revealed his cure would take 8 to 12 months. Ten months later, at the trial, an additional 12 to 16 months were added to this estimate. It would seem that at the time of signing the release appellee had been seriously misled (unintentionally of course) by medical advice on which he had a right to rely.

The case of Bay State Dredging Co. v. Porter, 1 Cir., 153 F.2d 827, contains language peculiarly appropriate to this case: " * * * bearing in mind that the insurance agent was negotiating with a seaman who was without benefit of counsel, we think the agent was under an obligation to bring home to the plaintiff an understanding of the rights he was giving up in exchange for the settlement offered. * * * At the very least he should have been told that he had an unbeatable right of action * * * for maintenance and cure, not dependent on proof of negligence; and that *in addition he had, under the Jones Act* [46 U.S.C.A. § 688], *a right to maintain an action at law for damages for injuries resulting from the negligence of any of the officers or employees of the defendant* * * *. Admittedly, the agent made no such disclosure to the plaintiff. Defendant

utterly failed to lay the necessary factual foundation upon which the validity of the release could have been submitted * * * of the jury." (Emphasis supplied.) 153 F.2d at pages 833, 834.

In Bonici v. Standard Oil Co., 2 Cir., 103 F.2d 437, certiorari denied, 308 U.S. 560, 60 S.Ct. 106, 84 L.Ed. 471, and Stuart v. Alcoa S. S. Co., 2 Cir., 143 F.2d 178, the actions of the trial judge in setting aside seamen's releases were sustained on the ground that, as in the present case, the injury later turned out to be more serious than was thought at the time the release was signed, and because "the seaman signed the release because of the diagnosis made by the shipowner's doctor." 143 F.2d at page 179.

In Sitchon v. American Export Lines, Inc., 2 Cir., 113 F.2d 830, certiorari denied, 311 U.S. 705, 61 S.Ct. 171, 85 L.Ed. 458, relied on by appellant, the seaman was represented by an attorney of his own choice, and he signed the release involved there upon the advice of his counsel. He had previously been examined and treated by doctors "entirely independent of the defendant". There the release was upheld, the Second Circuit Court of Appeals quite properly saying: "If such a settlement as the one in the case at bar is voidable, no release by a seaman could ever be free from attack, if he subsequently discovered that his injuries were greater than he anticipated when executing the release." 113 F.2d at page 832.

Appellant contends that even if appellee had consulted an attorney he could only have been advised that he had (1) a cause of action for damages provided he could prove negligence; (2) wages to the termination of the voyage provided his disability outlasted the voyage; and (3) maintenance until he recovered or reached a stage when medical treatment would not improve him. Appellant then argues that because appellee felt he was fully recovered on July 31, 1944, an attorney could only advise him that he might sue for damages hoping to prove negligence or settle and that $150 was a fair settlement for his injuries.

We cannot agree. The most probable first step any competent attorney would

take would be to advise appellee to consult a physician, rather than taking appellee's statement that he was fully recovered. And, since the Public Health Service ordered appellee hospitalized 17 days later, we cannot say with any degree of certainty that a doctor would have found appellee fully recovered on July 31.

## III.

■ It is conceded that if the release is set aside, appellee is entitled to wages to the end of the voyage. The District Court allowed appellee these wages in the sum of $480.17. Appellant does not dispute this sum as the correct allowance for wages, but contends that the total should be reduced by the applicable withholding and social security tax deductions. In view of our decision in The City of Avalon, 9 Cir., 156 F.2d 500, we think appellant's point is well taken.

Appellant also challenges the District Court's award to appellee of (1) increased maintenance to appellee during the 18 days he spent out of the hospital in Honolulu; (2) maintenance from July 30 to August 1, 1944, (the period after appellee reached San Francisco, and before he arrived at his home); and (3) travel allowance from San Francisco to San Pedro, California, his port of shipment.

■ We think the first two of these awards were proper. As to the first, there is some evidence to sustain the finding that appellee's maintenance in Honolulu cost him $3.50 per day rather than the $2.00 per day previously paid him by appellant, and in the absence of a contrary showing, we are not inclined to disturb this award. As to the second item, appellant denies liability for maintenance during these three days on the ground that appellee was fully recovered then and hence not entitled to any maintenance. The evidence is to the contrary.

The propriety of the travel allowance presents a different question in view of the fact that the shipping articles signed by appellee provided that War Shipping Administration Transportation Rider No. 64

should be included in the contract. This rider required that transportation should be furnished a seaman to his port of shipment, when the vessel on which he sailed returned to a United States port in an "area * * * other than the area * * * in which is located the port of shipment * * *".

Legal Bulletin No. 52 of the War Shipping Administration, a "Repatriation Chart for Seamen * * * separated in Foreign Ports from American Flag vessels * * *", cited by appellee, states the general rule that a seaman injured in the service of his vessel in a foreign port is entitled to be returned to his port of shipment [12] if the repatriating vessel lands him in a different United States continental port.

Legal Bulletin No. 52, however, then goes on to provide:

"A seaman [injured in the service of his vessel] is not entitled to transportation under the rider contained in Operations Regulation No. 64, since the rider contained therein provides for transportation only in the case of a crew member who joins a vessel in the continental United States and returns on the same vessel. No crew member who is separated from his vessel abroad for any reason, or who signs on a vessel abroad for return to this country, is entitled to transportation by virtue of the rider."

■ This interpretation, by the administrative agency which drafted the rider, not only carries great weight but also accords with our view that because the rider operated as a restriction on the seaman's right, under the general maritime law, to be repatriated to his port of shipment under all circumstances, a seaman who cannot bring himself within the terms of the rider is not entitled to a travel allowance back to his port of shipment when he is returned to some other United States port. Here appellee was covered by Rider No. 64, but because he was separated from his vessel abroad and returned to the United States on a different ship he cannot bring himself within the provisions of that rider authorizing transportation back to his port of shipment and is not entitled to travel ex-

---

[12] See The Hawaiian, D.C.Md., 33 F.Supp. 985; Miller v. United States, D.C.S.D.N.Y., 51 F.Supp. 924.

penses from San Francisco to the port of Los Angeles.

## IV.

Appellee has filed a cross-appeal and a motion to take further proof both of which are based on the contention that appellee is entitled to maintenance during the time he lived with his parents. Appellee has, with the exceptions previously noted of time spent in Government hospitals and rest centers, lived with his parents from August 1, 1944, to the time of trial here.

His only attempt to show that he had incurred any liability for his maintenance during this period was his testimony that he "felt an obligation to repay" his parents, and that he had used his own money which he approximated at $600 on his maintenance.

However, other testimony by appellee negatives these statements since, when asked "who paid for your room and board", appellee answered that his father and mother "stood the expenses", and appellee later admitted that all his food was "supplied", in addition to his room, laundry, and other necessary services.

Appellee further testified that he used money "he had borrowed" from his parents "to help pay the food and what little entertainment was offered me". We cannot understand this statement. If the parents furnished the food it seems improbable that he would borrow money from the parents to pay the parents. Furthermore, he makes no segregation between the amount expended for food and the amount expended for entertainment.

We think appellee was furnished his *necessary* living expenses without cost to himself and without liability to his parents. Under §§ 206 and 210 of the California Civil Code appellee's parents are required to maintain him to the extent of their ability since he was without funds and unable to maintain himself and they are not

entitled to compensation for this required support "in the absence of an agreement therefor". No such agreement having been shown, appellee has failed to establish that he had incurred any expense or obligation for necessary maintenance while he lived with his parents and, hence, cannot receive maintenance for that period. The Baymead, 9 Cir., 88 F.2d 144; Field v. Waterman S. S. Corporation, 5 Cir., 104 F.2d 849; Robinson v. Swayne & Hoyt (The Point Clear), D.C.S.D.Cal., 33 F.Supp. 93.

Appellee cites our decision in The City of Avalon, 9 Cir., 156 F.2d 500, but there the record clearly shows that the libellant paid for his room and board while he was unable to work.

Appellee refused hospitalization in the Marine Hospital in San Francisco because "I couldn't see going back to another hospital. It was just one doctor's opinion against a half dozen or more that I had seen already."

It appears to be well settled that a seaman's right to maintenance and cure is forfeited by voluntary rejection of hospital care.[13]

Here the refusal of the proffered hospitalization came "shortly after" appellee had been discharged from the rest center and had returned to his home. It thus appears that the greater part of the period for which he now claims maintenance is made up of time spent living with his parents after he had declined an offer of a physician to send him to a Marine Hospital for treatment which might have hastened his recovery.

Appellee's motion to take further proof in support of his claim for maintenance for the period since the trial in the District Court, during which time appellee has continued to live with his parents, is denied.

The decree of the District Court is ordered modified so as to conform to this opinion and as so modified the judgment is affirmed.

---

13 Bailey v. City of New York, 2 Cir., 153 F.2d 427; Meyer v. United States, 2 Cir., 112 F.2d 482; See, Calmar S. S. Corporation v. Taylor, 303 U.S. 525, 531, 58 S.Ct. 651, 82 L.Ed. 993; and Van Camp Sea Food Co. v. Nordyke, 9 Cir., 140 F.2d 902; certiorari denied 322 U.S. 760, 64 S.Ct. 1278, 88 L.Ed. 1587.