Jerry **CHARPENTIER**,
Plaintiff-Appellant,

v.

**FLUOR OCEAN SERVICES, INC., and
Liberty Mutual Insurance Co.,**
Defendants-Appellees.

No. 78–1715
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

March 6, 1980.

Rehearing and Rehearing En Banc
Denied April 9, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Robert A. Pitre, Jr., Gretna, La., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Donald L. King, W. K. Christovich, New Orleans, La., for defendants-appellees.

Before CHARLES CLARK, VANCE and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

Plaintiff Jerry Charpentier is a seaman who injured his knee while working on a barge owned by Fluor Ocean Services, Inc.

Charpentier brings this appeal to challenge the district court's finding that his maritime action is barred because he executed a valid release of his claim. Since the trial judge's factual findings are not clearly erroneous, we affirm.

On November 3, 1970, the plaintiff injured his right knee when he fell on the deck of Work Barge 107 during the course of his employment. The injury was so painful that Charpentier was sent home the next day and instructed to see the company physician, Dr. Boulet. Dr. Boulet diagnosed the injury as a bruised knee, prescribed pain medication, and sent the plaintiff back to work. Charpentier's knee failed to respond to this course of treatment, and Dr. Boulet referred him to Dr. Redler, an orthopedic specialist.

Dr. Redler examined plaintiff on December 8, 1970, and diagnosed his injury as traumatic prepatella bursitis. In January and November of 1971 Dr. Redler operated on Charpentier in an effort to repair the damaged right knee. Plaintiff remained under Dr. Redler's care until November, 1972.

During this period of treatment and rehabilitation, Charpentier and Hugh Greene, a claims adjuster for Liberty Mutual Insurance Company, engaged in settlement negotiations. On February 16, 1972, Greene and Charpentier agreed to settle the claim for $20,000, in addition to the $7,500 plaintiff had already received for maintenance, cure and medical expenses. The final settlement papers were to be executed within a couple of weeks.

The next day Charpentier returned to Dr. Redler's office to be discharged. Dr. Redler released the plaintiff from his care and stated on a handwritten note: "Some atrophy. Discharge. Estimate disability." In his medical report dated February 24, 1972, sent to Liberty Mutual's Baton Rouge office, Dr. Redler estimated that Jerry Charpentier would suffer a residual disability of 15% to his right lower extremity. Neither plaintiff nor Greene saw this report.

On February 29th, Mr. and Mrs. Charpentier kept their appointment with Donald King, the attorney Liberty Mutual had selected to conclude the settlement. King arranged for a court reporter to be present and to transcribe the settlement proceedings. Before Charpentier signed the release, King carefully advised him of his various legal rights. Plaintiff indicated that he understood the meaning of the release and stated that he was freely and voluntarily compromising his claim. He then signed the release, with his wife and the court reporter signing as witnesses.

Unfortunately for plaintiff, the pain in his right knee persisted. In late April, plaintiff returned to Dr. Redler and remained under his care until November, 1972. At that time plaintiff sought treatment at the United States Public Health Services Hospital. The Public Health doctors operated on plaintiff's knee twice, in August, 1973 and in April, 1977. Both surgical procedures were directly related to the November 3, 1970 fall.

Plaintiff sought legal advice for the first time after signing the release, upon discovering the extent of his disability. In February, 1973, he filed this Jones Act action to recover for the injuries sustained as a result of the fall. In 1975, the district court entered summary judgment for the Defendant Fluor on the ground that the release barred Charpentier's Jones Act claim. This judgment was entered even though plaintiff filed an affidavit alleging that defendant overreached plaintiff in the settlement negotiations.

On appeal, this Court reversed the summary judgment for Fluor and remanded the case for trial on the release issue. *Charpentier v. Fluor Ocean Services Inc.*, 534 F.2d 71 (5th Cir. 1976). We held that Charpentier's allegations, taken as true and in a light most favorable to him, made out a case of concealment and would justify invalidating the release.

The issue of the validity of the release was tried to the district court on December 15, 1977. Testimony was taken from various witnesses, including Charpentier and Dr. Redler, and the defense introduced into

evidence the transcript of the February 29, 1972, settlement discussion between the defendant's attorney and the plaintiff. After considering all the evidence, the trial court held the release to be valid and entered judgment for the defendant. It is this determination that forms the basis of this appeal.

Historically, our nation has displayed a special solicitude toward seamen and their contractual relationships. The first Congress enacted legislation to protect the wage contracts of those in the merchant marine service and to provide summary remedies for breaches of those contracts. 1 Stat. 131 (1790). The judiciary has long echoed this concern. Justice Story, sitting on the Circuit in 1823, stated that:

> They [seamen] are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees.

*Harden v. Gordon*, 11 Fed.Cas. at 480, 2 Mason 541 (1 Cir. 1823).

■ In *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942), the Supreme Court stated that careful scrutiny is also to be given to seamen's releases.

> We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights.

Id. at 248, 63 S.Ct. at 252. This Circuit, in accordance with *Garrett*, requires the party seeking to use the seaman's release as a defense to show that the seaman "[had] an informed understanding of his rights and a full appreciation of the consequences" when he executed the release. *Cates v. United States*, 451 F.2d 411, 414 (5th Cir. 1971); *Blanco v. Moran Shipping Co.*, 483 F.2d 63 (5th Cir. 1973).

■ Plaintiff contends that the defendant failed to meet this heavy burden on three counts. Plaintiff argues first that the district court was clearly erroneous in finding that the plaintiff was informed of and fully understood his legal rights prior to executing the release. We disagree. Indeed, the record reveals that the defendant took great care to be certain that plaintiff was not uninformed or misled.

At the February 29, 1972, settlement conference Mr. King, the insurance company's attorney, advised Mr. and Mrs. Charpentier of his rights as a seaman. King distinguished the Louisiana Workmen's Compensation Act, the Longshoremen's and Harbor Workers' Compensation Act and the Jones Act for the plaintiff and detailed his rights under each Act. King also discussed thoroughly comparative negligence, unseaworthiness, maintenance and cure, the various elements of damages, and the right to counsel with the plaintiff and his wife. Finally, King ascertained that plaintiff understood the release and the binding effect it would have on any claim plaintiff might want to bring.

"Q. Now, do you understand that if you sign this receipt and release this is the end of the claim?

A. Like the old saying goes, you mean that's my potato."

Our review of the record does not establish that the trial court was clearly erroneous in concluding that plaintiff was informed of his legal rights.

Plaintiff's second contention is that the trial court erred in concluding that there was no mistake of fact when the release was executed. Charpentier points to his testimony at trial that Dr. Redler discharged him and told him that he would recover from the injury and be able to return to normal duties in two or three months. This, plaintiff argues, created a mistake of fact. At the time of discharge he was not free of disease and just in need of time to heal. Rather, at the time of discharge his injury was still present and serious, as evidenced by the two subsequent operations he required.

■ Plaintiff's testimony was controverted by Dr. Redler. Dr. Redler testified that he informed plaintiff that he had a permanent disability. The doctor further testified that he neither told plaintiff he would be able to return to work in a couple of months nor did he even tell plaintiff that he could eventually return to his former occupation. Charpentier himself admitted at trial that he knew his knee would never be as sturdy as it was prior to the injury. The district judge, in his findings of fact, expressly stated that he accepted the testimony of Dr. Redler, which he found to be credible. It is this type of credibility. determination that we are most reluctant to reverse on appeal.

A mistaken diagnosis concerning the extent of a plaintiff's injury has been recognized as a basis for setting aside a release. *Bonici v. Standard Oil Co.*, 103 F.2d 437, 439 (2d Cir. 1939); *Wooten v. Skibs A/S Samuel Bakke*, 431 F.2d 821, 822 (4th Cir. 1969). In *Bonici* a plaintiff missed several months of work due to shoulder problems after signing a release. Prior to the execution of the release, the company doctor had told plaintiff that his injured arm was in good shape and that he would be ready to work in five to ten days. The doctor advised the seaman that the pain he was experiencing in his left shoulder was caused by infected tonsils, and not by the arm injury. The doctor's report bore out this diagnosis. The Court refused to uphold the release and held plaintiff was entitled to maintenance and cure for the period of time after he signed the release that he was disabled.

In *Wooten* the plaintiff signed a release after being told by the company doctor that his injury was not permanent. Plaintiff later filed suit and alleged that a subsequent medical examination had revealed a permanent disability due to the injury. The court reversed a grant of summary judgment for defendant, and held that a question of fact was created by plaintiff's allegation. The court went on to state that if the jury found the injury to be perma-

nent, the release should be declared invalid. If the injury was found to be temporary, the release was to be upheld and enforced.

■ In *Bonici* and *Wooten* the courts were unable to say that the seaman had a full appreciation of his physical condition when he executed the release. Both plaintiffs discovered, after signing a release, that they were suffering a disability in excess of that diagnosed by the company doctor. Mr. Charpentier does not suffer from that evil. He claims that because his knee injury lingered longer than expected and required more medical care then expected, the trial court should have found a mistake of fact and invalidated the release. We cannot agree. The evidence supports the trial court's finding that plaintiff understood the causes and nature of his disability, appreciated their potential ramifications, and that the possibility of an extended rehabilitation period or the necessity of further medical care for his knee were risks plaintiff chose to accept when he signed the release. *See Strange v. Gulf & South American S.S. Co.*, 495 F.2d 1235 (5th Cir. 1974).

■ Plaintiff's third contention is that the defendant's failure to disclose Dr. Redler's diagnosis of a 15% permanent disability taints the trial court's finding that plaintiff had an "informed understanding" when he executed the release. After reviewing the record, we are unable to agree with the plaintiff's argument.

At trial, Dr. Redler testified that he told plaintiff he would suffer some permanent disability as a result of the injury. Additionally, Charpentier testified that he knew his knee "wouldn't be like I had it before . . . ." The evidence supports the conclusion that plaintiff knew he would suffer a permanent disability. We do not disagree with the district court's conclusion that plaintiff's ability to make an informed decision regarding settlement was *not impaired* just because he was not told the exact percentage of his permanent disability.[1]

---

1. We also agree with the trial judge's conclusion that had the percent disability been substantially greater, the opposite result may have been justified. For example, had Dr. Redler's

Finally, plaintiff submits that his right to a jury trial on the release issue was violated. The record shows that both the plaintiff and his attorney expressly stated at the beginning of the trial that they would waive a jury and allow the court to be the finder of fact regarding the validity of the release. In light of this waiver, we reject plaintiff's argument that he was denied his right to a jury trial.

Finding no merit in plaintiff's arguments, the opinion of the district court is

AFFIRMED.

diagnosis been that plaintiff will suffer a 75% permanent partial disability as a result of the injury, a holding that the plaintiff was unable to make an informed decision about whether to execute the release would be in order. Wheth-er the failure to reveal the exact degree of disability impairs a plaintiff's informed understanding of his condition will depend upon the facts of the case.