247 F.3d 953 (9th Cir. 2001)
 JOSEPH ORSINI, Plaintiff-Appellant,
v.
O/S SEABROOKE O.N., 614,410 her engines, gear, tackle furniture and appurtenances in rem; SEABROOKE, INC., an Alaska corporation; WILLARD S. FERRIS, Defendants-Appellees.
 No. 99-35588
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 15, 2001,
Filed April 24, 2001
 
 [Copyrighted Material Omitted]
 Steven P. Gray, Gray, McLean, Cole & Razo, Kodiak, Alaska, for the plaintiff-appellant.
 Laura L. Farley, Le Gros, Buchanan & Paul, Anchorage, Alaska, for the defendants-appellees.
 Amanda A. Owen, Le Gros, Buchanan & Paul, Seattle, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the District of Alaska. D.C. No. CV-98-00196-HRH. H. Russel Holland, Chief District Judge, Presiding.
 Before: Stephen Reinhardt, Kim McLane Wardlaw and Ronald M. Gould, Circuit Judges.
 GOULD, Circuit Judge:
 
 
 1
 This case involves the enforceability of a seaman's release under the law of admiralty. Joseph Orsini ("Orsini") injured his right arm and wrist while working aboard the crab fishing vessel O/S SEABROOKE. Orsini sued the ship O/S SEA-BROOKE, in rem, as well as Seabrooke, Inc. and Willard Ferris, the ship's owner (collectively "Seabrooke"). Orsini asserted claims for negligence under the Jones Act, unseaworthiness, maintenance and cure, and attorneys' fees. The district court granted Seabrooke's motion for summary judgment, ruling that in exchange for cure, earned wages, airfare home, and $ 500, Orsini signed an enforceable release (the "Release") that precluded Orsini's claims. Orsini appeals, and we have jurisdiction pursuant to 28 U.S.C. 1291. We reverse and remand because Seabrooke has not established the enforceability of the Release.
 
 FACTS AND PROCEEDINGS BELOW[1]
 
 2
 David Norton ("Norton"), captain of the ship, O/S SEABROOKE, hired Orsini out of Kodiak, Alaska on January 9, 1998, for the Bering Sea crab fishery. The ship left Kodiak the next day and started fishing on January 17, 1998.
 
 
 3
 From January 17-23, 1998, the crew hauled crabs. Orsini's job was to untie the crab pot when brought onboard and hold open the pot door when the catch was mechanically shaken out. Orsini's right hand and arm began to hurt on January 19, 1998, while he was performing these duties. Orsini continued to work with the injury.
 
 
 4
 Five days later, the ship anchored near Dutch Harbor, Ulalaska, Alaska. Orsini reported to Norton that his right wrist was swollen and hurt, and his right arm was sore. Norton gave Orsini and another injured crew member permission to seek medical attention when the ship docked. Orsini gave a personal injury report describing numbness and pain from his fingers to elbow and stating that he was injured on January 19th holding open the door to a crab pot.
 
 
 5
 Orsini was treated at a health clinic in Ulalaska by a physician's assistant who Orsini thought was a doctor. This assistant diagnosed Orsini as suffering from carpel tunnel syndrome in his wrist, an overuse injury, and recommended surgery before returning to fishing. Orsini was given a limited work release for an "Overuse Injury (R) wrist, "and told to wear a wrist splint and restrict the use of his right hand.
 
 
 6
 Returning to the ship and presenting the work release, Orsini told Norton that the "doctor" did not want him to work but Orsini sought medical clearance for one more trip to allow Norton to find a replacement. They could not agree on suitable work given Orsini's injury. Norton has stated that Orsini agreed that if Norton would pay his earned wages and future medical bills for the injury, Orsini would call it even. Orsini has denied proposing settlement terms, and our review of the summary judgment for Seabrooke accepts Orsini's version of these facts.
 
 
 7
 Norton gave Orsini a "Release of All Claims" that had been approved by Ferris and faxed by the ship's insurance agent, Fritz Johnston ("Johnston") of Pacific Claims, Inc. Norton has stated that he "decided to give" Orsini an additional $ 500, by adding it to the terms of the Release, in recognition of Orsini's "inconvenience."
 
 
 8
 According to Orsini, Norton presented him with three options: (1) Orsini could sign the Release and get off the ship; (2) Orsini could stay on the ship and work one more trip until replaced; or (3) Orsini could find a place to stay in Dutch Harbor until the weather improved and then find his way home.
 
 
 9
 Orsini was summoned by a shipmate to talk with the crew. The crew members told Orsini that the ship was not at fault for his carpal tunnel syndrome, and that he should sign the Release. The crew told Orsini that unless he signed the Release, Ferris would not hire another crew member because Ferris would have to pay Orsini his share for the season, and that it was unfair to make the rest of the crew pick up the slack for Orsini's inability to work without limitation. Orsini by affidavit has stated that he agreed to sign the Release because he did not believe his overuse injury was caused by his work on the ship, did not comprehend the severity of his injury, and at the time had no intention to sue the ship.
 
 
 10
 Norton and Orsini reviewed the Release on January 27, 1998. Without consulting an attorney, Orsini signed the Release the next day before four witnesses. When Orsini signed the Release, he was not sure if the ship was legally obligated to pay for his return or for his maintenance.
 
 The Release in pertinent part reads[2] :
 RELEASE OF ALL CLAIMS
 READ CAREFULLY
 
 11
 By signing this you give up EVERY right you have.
 
 
 12
 I, Joseph R. Orsini, ... in exchange for the sum of earned wages at 4%, and an airplane ticket and medical expenses and $ 500.00 dollars which I have received, do hereby Release and forever discharge M/V Seabrooke; M/V Seabrooke Inc.; Charterers et. al. its successors and assigns, the Seabrooke ... of each and every right or claim which I now have, or may hereafter have, because of any matter or thing which happened before the signing of this paper; including every claim for damages, maintenance, wages, cure, transportation, reimbursement, or expenses, under any law of the United States or any state, whether or not now in existence or known to me or whether it develops or becomes known to me in the future, which in any way arises out of or is connected with my employment on the Seabrooke from 01/08/98 to 01/27/98 or with the personal injuries sustained by me on or about the 24th day of January, 1998 during the period of the employment, as for example, any and all injuries sustained; specifically sore arms for which I have been released to limited duty for 1 to 2 weeks
 
 
 13
 *SEE ATTACHED ADDENDUM *
 
 THIS IS A RELEASE
 
 14
 I am giving up every right I have.
 
 
 15
 [Page 2][3]
 
 
 16
 that now are not known to me. I also know that I am taking the risk that injuries I do not know of may be or may turn out to be worse than they seem to me now. I take all these risks. I know I am giving up the right to any further money. I am satisfied.
 
 
 17
 I further warrant that the above mentioned sum is received by me in full settlement and satisfaction of all the aforesaid claims, and demands whatsoever.
 
 
 18
 The Release also required Orsini to answer several questions. Orsini wrote "yes" to the question "do you know that signing this paper settles and ends EVERY claim that you may have for DAMAGES as well as for transportation, maintenance, cure, wages, and all other claims?" The Release's addendum provided for Orsini: (1) $ 500; (2) earned wages for the first trip of the season; (3) an airplane ticket to Kodiak; and (4) "the cost of possible curative medical treatment for an overuse arm injury, related to my service aboard the F/V Seabrooke."
 
 
 19
 Orsini flew from Dutch Harbor to Kodiak and was examined by an orthopedic surgeon, Dr. Shrirang M. Lele. Dr. Lele initially diagnosed Orsini with flexor tendinitis and noted that "ulnar neuritis is worth considering." After doing a nerve conducting study on Orsini's arm, Dr. Lele determined that Orsini had ulnar nerve entrapment at the elbow. On March 3, 1998, Dr. Lele noted Orsini's continued numbness in his hand and discussed ulnar nerve transfer surgery with Orsini. Dr. Lele noted that Orsini was willing to have the surgery, and that the surgery would "be arranged in the next few days." Orsini contends that Johnston, the insurance agent for the ship, requested a second opinion and made arrangements for Orsini to see Dr. Louis Kralick, a neurological surgeon. On March 31, 1998, Dr. Kralick confirmed Dr. Lele's diagnosis of Orsini's injury and reported that Orsini "certainly could have developed this neuropathy over one week and if it continues to persist with time and conservative management then consideration for right ulnar nerve transposition would be appropriate."
 
 
 20
 Orsini unsuccessfully requested a commitment from Johnston to authorize the surgery. Orsini then hired an attorney who sent Johnston a demand letter on April 24, 1998. Johnston responded that Ferris had not approved the surgery. Orsini visited Dr. Kralick on June 16, 1998, who reported in a letter to Johnston that Kralick and Orsini had discussed the surgery and that "arrangements are currently being made for authorization and scheduling of the procedure at [Orsini's] request." According to Orsini, the surgery was originally scheduled for June 17, 1998, but was canceled because there was no authorization from Ferris.
 
 
 21
 Orsini filed a complaint in district court claiming (1) maintenance, cure, and unearned wages under maritime law; (2) damages for negligence under the Jones Act and unseaworthiness of the vessel; and (3) attorneys' fees for Seabrooke's refusal to pay for his medical cure in a timely fashion.
 
 
 22
 Orsini underwent surgery on August 26, 1998, and was unable to work during recovery. He received three maintenance payments from Pacific Claims, Inc. totaling $ 2,650 and covering the period from August 26 to December 9, 1998. Seabrooke has also paid Orsini's complete medical expenses, $ 8,084.69 in total.
 
 
 23
 Seabrooke filed a motion for summary judgment contending that Orsini executed a valid and enforceable release that barred all of Orsini's claims. The district court agreed and granted Seabrooke's motion dismissing Orsini's complaint with prejudice. Orsini's appeal brings to us the question whether summary judgment was properly granted.
 
 STANDARD OF REVIEW
 
 24
 A grant of summary judgment is reviewed de novo. Botosan v. Paul McNally Realty, 216 F.3d 827, 830 (9th Cir. 2000). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). In ruling on a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In this procedural setting we accept Orsini's testimony by affidavit as true, even though some facts may be in dispute.
 
 DISCUSSION
 A. Enforceability of the Release
 
 25
 Applicable law requires that we scrutinize the validity of a seaman's release under principles of admiralty law analogous to the duty owed by a fiduciary to a beneficiary, not solely under principles of contract law. Garrett v. Moore-McCormack Co., 317 U.S. 239, 247, 87 L. Ed. 239, 63 S. Ct. 246 (1942). In Garrett, the United States Supreme Court relied on the celebrated language of Justice Story who, while sitting on Circuit in 1823, made clear that seamen are "wards of the admiralty." Id. at 246. The Court endorsed and quoted Justice Story's explanation that agreements of seamen should be disregarded and set aside "if there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other." Id. (quoting Harden v. Gordon, 2 Mason C.C. 541, 11 F. Cas. 480, 485 (C.C.D. Me. 1823) (No. 6,047) (Story, J.). Garrett continues:
 
 
 26
 The analogy suggested by Justice Story in the paragraph quoted above between seamen's contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one. Whether the transaction under consideration is a contract, sale, or gift between guardian and ward or between trustee and cestui, the burden of proving its validity is on the fiduciary. He must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration.
 
 
 27
 Id. at 247.
 
 Garrett goes on to hold:
 
 28
 [T]he burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.
 
 
 29
 Id. at 248; see also Resner v. Arctic Orion Fisheries, 83 F.3d 271, 273-74 (9th Cir. 1996) (quoting Garrett).
 
 
 30
 Garrett establishes a two-part test in determining the enforceability of a seaman's release: (1) whether the release was executed freely, without deception or coercion; and (2) whether it was made by the seaman with full understanding of his rights. To apply the second part of the test, we consider: (1) the adequacy of the consideration; (2) the nature of the medical advice available to the seaman at the time of signing the release; and (3) the nature of the legal advice available to the seaman at the time of signing the release.
 
 
 31
 We now consider the questions raised by the Garrett test.
 
 
 32
 1. Was the Release executed freely, without deception or coercion?
 
 
 33
 The district court did not address whether the Release was "executed freely, without deception or coercion. "Orsini alleges coercion, not deception. The facts alleged in Orsini's affidavit, if true, would establish some degree of coercion.
 
 
 34
 Orsini contends that the crew pressured him to sign the Release by urging that it would be unfair for the crew to "pick up [Orsini's] slack" because his injury made him unable to perform his work properly. Orsini also contends that he was aware that the ship already "had one man on deck with injured ribs" and was shorthanded.
 
 
 35
 Orsini further contends that Norton presented him with two other options, neither of which was viable. First, Orsini contends, he could not stay on the ship and work one more trip before being replaced because of the pressure exerted by the other crew members. Second, Orsini contends, remaining onshore was not an option because he had no place to stay in Dutch Harbor, an isolated locale in the Aleutian Islands, two plane trips from his home in Kodiak. Although Orsini was entitled to the flight home and probably to at least the compensation provided for in the Release, because these rights were not explained to him, Orsini contends that the pressure of the other two options was real, and he felt coerced into signing the Release. All of Orsini's contentions are supported by the facts to which he testified based on personal knowledge in his affidavit.
 
 
 36
 There is, to be sure, some evidence challenging the notion that Orsini was coerced. The first consideration is Norton's suggestion that Orsini initiated the deal. However, this has marginal or no relevance to whether there was coercion, and in any event, was disputed by Orsini. The second consideration is that Orsini never objected to or questioned the Release during the review process that culminated in its signing. This second point could support Seabrooke's contention that the Release was executed freely. Nonetheless, there remains evidence of coercion that is relevant to the Release's enforceability.[4]
 
 
 37
 2. Did Orsini sign the Release with full understanding of his rights?
 
 
 38
 The second part of the Garrett standard is whether Orsini had a full understanding of his rights. This requires us to consider adequacy of consideration, available medical advice, and legal advice.
 
 
 39
 a. Adequacy of Consideration
 
 
 40
 The first factor is the adequacy of the consideration provided for in the Release. The district court concluded that "failure of consideration" was not a "defense" to the Release. Even though the district court quoted the proper standard for a seaman's release from Garrett, it did not discuss the distinct burden Garrett places on Seabrooke as a fiduciary. Instead, the district court analyzed the enforceability of the Release by considering solely Orsini's "contractual defenses": (1) failure of consideration; (2) mutual mistake; and (3) non-performance on the Release's terms. These issues of contract defense may overlap but do not supplant the test required by Garrett.
 
 
 41
 The district court cited the Release's provisions for a payment of $ 500, a promise of payment of all medical bills, and an airplane ticket home as valuable consideration. In addition, the district court stated that Seabrooke paid Orsini's maintenance after surgery. The district court also cited the Release's provision that the consideration was received "in full settlement and satisfaction of all aforesaid claims and demands whatsoever."
 
 
 42
 The district court erred by interpreting consideration under normal contract law, without considering the fiduciary principles of maritime law required by Garrett. Adequacy of consideration must be understood with reference to Orsini's rights as a seaman. Viewing the facts most favorably to Orsini, the consideration was not adequate, and it may have been grossly inadequate if Seabrooke had a pre-existing legal duty to provide more consideration than that to which Orsini agreed by signing the Release.
 
 
 43
 In Blake v. W.R. Chamberlin & Co., 176 F.2d 511 (9th Cir. 1949), we approved of the district court's following jury instruction:
 
 
 44
 If, for example, defendant paid to plaintiff money to which plaintiff was already entitled, that is, earned wages, earned maintenance, and bonus, and things of like character, then if you so find, the taking of the release for other things such as damages and future maintenance would be without consideration and the release would be void. In other words, a release is not valid if what is paid is something to which a person is entitled under any circumstances of the case.
 
 
 45
 Id. at 513 n.1. The parties agree that Orsini was entitled to earned wages and return transportation to Kodiak where he was hired. If Orsini was injured aboard the ship, he would be entitled to maintenance and cure until the point of his maximum medical recovery from his injuries. Farrell v. United States, 336 U.S. 511, 517-19, 93 L. Ed. 850, 69 S. Ct. 707 (1949); Crooks v. United States, 459 F.2d 631, 633 (9th Cir. 1972). Orsini would also be entitled to unearned wages from the onset of the injury until the end of the voyage. Gardiner v. Sea-Land Serv., Inc., 786 F.2d 943, 946 (9th Cir. 1986).
 
 
 46
 That Seabrooke paid some maintenance to Orsini after his surgery is of limited significance. Maintenance was not part of the consideration in the Release. If Orsini's testimony by affidavit is credited, he may have been entitled to maintenance for a longer period and greater total than Seabrooke paid.[5] When considering the adequacy of consideration for the Release, the district court should have assessed Seabrooke's obligation to pay maintenance and unearned wages through the end of the voyage.
 
 
 47
 Orsini did not get much from the Release. Orsini may have received less than his legal entitlement absent the Release. Orsini received the plane ticket home, but he was entitled to the ticket. He received earned wages, but he was entitled to earned wages. He received cure, but he was entitled to cure. In addition, he received $ 500. For this, he gave up his right to maintenance, unearned wages, and the opportunity to sue for negligence under the Jones Act and unseaworthiness under maritime law.
 
 
 48
 Because part of what Orsini waived was his ability to consider further legal action, it is appropriate to consider his potential damages and recovery. See Resner, 83 F.3d at 274 (finding payment of $ 16,200 "plainly inadequate for the loss of four fingers"); Braxton v. Zapata Offshore Co., 684 F. Supp. 921, 922 (E.D. Tex. 1988) (in determining the adequacy of the consideration asking "was the plaintiff fairly compensated given the extent of his injuries, and the inherent risk of trying the case?"). In our view, $ 500 is wholly inadequate in light of Orsini's waiver of future claims and the extent of his injury.
 
 
 49
 While a full discussion of the merits of the negligence and unseaworthiness actions is not necessary here, Orsini's claims as alleged have a proper basis on their face. In his affidavit, Orsini questioned the safety of the ship's procedures relating to the retrieval of the catch from the crab pots. Dr. Kralick reported that Orsini's ulnar nerve injury could have developed within a week, the period in which Orsini was working the crab pots on the ship.
 
 
 50
 Another consideration is the "manner in which the amount of consideration was determined." Resner, 83 F.3d at 274. Consideration is more likely adequate if based on "an informed evaluation of [a seaman's] damages. "Id. There is no evidence that the amount of consideration was based on such an informed analysis. Viewing the facts most favorably to Orsini, it is clear that he was not informed about his legal rights, and it cannot fairly be said that he made an informed decision. Further, even Seabrooke's decision on settlement could hardly be called informed. In fact, the $ 500 was determined by Norton in an apparently subjective manner, based on his assessment of Orsini's "inconvenience."
 
 
 51
 Seabrooke has not met its burden on summary judgment to establish that consideration was adequate. To the contrary, if all inferences are given Orsini, and indeed even absent favorable inferences, the consideration was patently inadequate.
 
 
 52
 Inadequate consideration alone is not sufficient to invalidate the Release; however, it makes Seabrooke's burden of proving enforceability "particularly heavy." Id. However, if consideration is grossly inadequate --less than the amount a seaman is entitled to as a matter of law in maintenance and cure in any view of the facts --we follow the per se rule in Blake and hold that a release is invalid as a matter of law. On this record, while it appears likely that the consideration is grossly inadequate, we need not and do not resolve that question here.
 
 
 53
 b. Medical Advice
 
 
 54
 The next factor we consider is whether the medical advice available to Orsini showed that he had a full understanding of his rights. The district court concluded that the fact that "Orsini executed the Release when he had been incorrectly diagnosed as having carpel tunnel disease does not constitute a mutual mistake voiding the contract."[6] The court found that, although Orsini might have been mistaken about the exact extent of his injury, Orsini was aware that the injury was restricted to his arm and was advised that he might need surgery. Despite the district court's conclusion, the evidence shows that Orsini's inaccurate understanding of his medical condition is a factor weighing strongly against the Release's enforceability.
 
 
 55
 We approved of the following jury instruction concerning medical advice in Blake:
 
 
 56
 [I]f the plaintiff was advised by the defendant that his condition was less serious than the defendant either knew or, by the exercise of reasonable care, he should have known, or if the advice given to him was not sound or proper, you are then instructed that this factor may be considered by you in determining the validity of the release.
 
 
 57
 Blake, 176 F.2d at 513 n.1. Orsini believed when he signed the Release that he was suffering from an overuse injury to his arm. Upon this premise, he did not believe the injury was caused by work on the ship because his service aboard the ship had been short. The original diagnosis was incorrect. The true cause of his disability was an ulnar nerve disorder, which could have been caused by the work handling the ship's crab pots. The misdiagnosis may have led Orsini to undervalue his claims against the ship.
 
 
 58
 Seabrooke relies on Charpentier v. Fluor Ocean Services., Inc., 613 F.2d 81 (5th Cir. 1980), to argue that even if Orsini was ignorant of the precise etiology of his injury, his knowledge was sufficient to satisfy Garrett. In Charpentier, the court considered a situation where a seaman signed a release after undergoing knee surgery for injuries suffered aboard a ship; the surgeon estimated his residual permanent disability at fifteen percent but did not disclose this estimate to the seaman. Id. at 82-83. After signing the release, the seaman underwent two more surgeries and was never able to return to his line of work. Id. at 83. The court upheld the release relying on the fact that the surgeon had informed the seaman that he would be permanently disabled and never told the seaman that he would be able to return to his job. Id. at 85. The court concluded that, even though the seaman was not told the" exact percentage of his permanent disability," he "understood the causes and nature of his disability, appreciated their potential ramifications, and that the possibility of an extended rehabilitation period or the necessity of further medical care for his knee were risks plaintiff chose to accept when he signed the release." Id.
 
 
 59
 Charpentier is clearly distinguishable. Orsini claims he did not understand the cause or nature of his disability and its possible future impact on his ability to work. Seabrooke has not met its burden in establishing that Orsini's understanding of his injury was accurate enough for him properly to assess his entitlements and rights. Orsini knew when signing the Release that surgery was recommended. This weighs against Orsini. Nonetheless, Orsini reasonably could have believed that an overuse injury was not as severe an injury as an ulnar nerve disorder. More importantly, Orsini reasonably could have believed that the cause of his injuries, if from overuse and repetitive stress, was other than his recent service aboard the ship. In contrast, if the injury was an ulnar nerve disorder, it more likely was caused by work aboard the ship. The misdiagnosis was critical to Orsini's understanding of his rights and could have discouraged a claim against the ship.
 
 
 60
 c. Legal Advice
 
 
 61
 The next factor we consider is whether the legal advice available to Orsini showed that he had full understanding of his rights. The district court erred by not considering evidence that Orsini did not receive adequate legal advice before the Release was signed. The district court relied on the fact that the Release's terms made it clear that Orsini waived his right to bring future claims, that Orsini carefully reviewed the Release with Norton, and that he signed the Release" freely, without any coercion."
 
 
 62
 While we understand why the district court may have given these factors some weight, they are not sufficient for Seabrooke to establish whether Orsini "knowingly and voluntarily" signed away his rights. Seabrooke must further establish that Orsini initially had "a full understanding "of these rights. Garrett, 317 U.S. at 251-52. The evidence in the record --the Release itself, Norton's description of the circumstances, and the witnesses --shows that Orsini understood that whatever rights he possessed, he relinquished them by signing the Release. This awareness is relevant to the Release's enforceability. However, it is not the main inquiry mandated by Garrett, and is not sufficient alone, or with other evidence before us, to support a conclusion that legal advice was adequate.
 
 
 63
 Because Orsini was not represented by counsel, the vessel's owner or agent was obligated to advise him of his undisputed legal rights and possible causes of action against the ship. Waters v. United States, 191 F.2d 212, 216-17 (9th Cir. 1951); United States v. Johnson, 160 F.2d 789, 795-96 (9th Cir. 1947), cert. granted, 332 U.S. 754 (1947), rev'd in part on other grounds, 333 U.S. 46 (1948). Where an injured seaman is not represented by counsel, it is the owner's obligation to make a "full, fair and complete disclosure as to all of [a seaman's] rights, including his right to sue for damages under the Jones Act, and his right to wages, maintenance and cure under the applicable Seamen's Law." Blake, 176 F.2d at 513 n.1. These rules are designed to protect seamen injured at sea, usually far from home, who, particularly when injured, are to be treated as wards of the vessel. In admiralty, law imposes a restraint on what normally on land might be viewed as hard bargaining between employer and employee. Applying these principles, we have held a vessel's legal advice to an unrepresented seaman to be inadequate, as one factor in a Garrett analysis, where, if informed, he would have been less likely to make a deal. We thus rejected a release where the seaman "might have been less eager to sign away his rights had he more fully understood the level of responsibility that vessel owners bear under the Jones Act and the doctrine of unseaworthiness, and the differences between these remedies, the general law of torts, and workers' compensation schemes." Resner, 83 F.3d at 274. For legal advice to be considered adequate in a Garrett analysis, an unrepresented seaman is entitled to a fair discussion of his or her entitlements to maintenance and cure, and alerted to the possibility of tort remedies including those for negligence and unseaworthiness.[7]
 
 
 64
 Orsini did not consult an attorney before signing the Release. There is no evidence that Orsini fully understood his rights. To the contrary, Orsini was not informed of even his basic entitlements. Orsini was not told by the ship of his rights to maintenance and cure and to transportation home. He was not told of the possibility of claims for negligence and unseaworthiness. Orsini's lack of understanding is plain. It appears that Orsini signed a document agreeing to take less than that to which he otherwise would have been entitled.
 
 
 65
 We have found a release invalid when a seaman had no independent legal advice, and his only medical advice was an incorrect diagnosis of the severity of an injury. Johnson, 160 F.2d at 796.[8] Johnson is strikingly similar to the facts of this case because Orsini had no independent legal advice and the medical advice he received before signing the Release was inaccurate.
 
 3. Conclusion
 
 66
 Seabrooke has not met its burden to establish the Release's enforceability. On each separate part of the Garrett test, and considering this test as a whole, Seabrooke has not met its burden. Seabrooke was not entitled to a summary judgment upholding the Release.
 
 B. Delay in Authorizing Surgery
 
 67
 There is another issue. Opposing summary judgment, Orsini contended that the Release was unenforceable because Seabrooke materially breached its terms by delaying Orsini's surgery. The district court rejected this, concluding that the Release precluded damages arising from Seabrooke's actions after execution of the Release. The Release stated that "because of any matter or thing which happened before the signing of this paper," Orsini agreed to release claims, "whether or not now in existence or known to [him] or whether it develops or becomes known to [him] in the future. "Even if the Release is valid, this language does not support the conclusion that the Release can waive claims for Seabrooke's future conduct.
 
 
 68
 In Miles v. American Seafoods Co., 197 F.3d 1032 (9th Cir. 1999), we examined a release with almost identical language. Id. at 1033. We held that this language did not release claims arising from recurrence of a shoulder injury after execution of the release. The seaman suffered the recurrence of the injury working on the vessel under a new contract. Id. at 1034. We concluded that any ambiguities or doubts in the interpretation of a seaman's release of claims for injury against the owner must be decided in favor of the seaman. Id. (quoting Vaughan v. Atkinson, 369 U.S. 527, 531-32, 8 L. Ed. 2d 88, 82 S. Ct. 997 (1962)). Miles is persuasive. If Seabrooke improperly delayed surgery, that supports a claim that was not settled by the Release.
 
 
 69
 Alternatively, the district court concluded that "even if Orsini had not waived his right to bring this claim, he had failed to put forth sufficient evidence that the delay was due to the defendants' actions." We disagree. In March 1998, Dr. Lele noted Orsini's willingness to undergo surgery and said it would "be arranged in the next few days." After Orsini delayed surgery for a second opinion at Seabrooke's request, Orsini had to cancel a scheduled June surgery date and post-pone surgery for another two months because Seabrooke delayed authorization. There is evidence sufficient to raise a genuine issue of material fact whether Seabrooke contributed to a delay in the surgery.
 
 CONCLUSION
 
 70
 We REVERSE the district court's grant of summary judgment in favor of Seabrooke, and we REMAND for further proceedings consistent with this opinion.
 
 
 71
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Many facts herein are set forth in Orsini's affidavit opposing summary judgment; most are undisputed. Because Orsini appeals a summary judgment against him, we view the evidence in the light most favorable to Orsini as the non-moving party. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998). To the extent facts are disputed, for purposes of this appeal we view conflicts in the evidence in favor of Orsini. Behrens v. Pelletier, 516 U.S. 299, 313, 133 L. Ed. 2d 773, 116 S. Ct. 834 (1996).
 
 
 [2]
 Release text that was handwritten by the parties is underlined here.
 
 
 [3]
 Text may have been omitted in the transition from the first to the second page of the copy of the Release found in the record. However, if any text is missing between pages one and two, the parties do not suggest that the possibly omitted language is material.
 
 
 [4]
 Seabrooke also argues that Orsini did not meet his burden under Federal Rule of Civil Procedure 56 to set forth admissible, "specific facts showing that there is a genuine issue for trial" because his affidavit contains inadmissible hearsay and conclusory and speculative statements of fact. Fed. R. Civ. P. 56(e). See also Shane v. Greyhound Lines, Inc., 868 F.2d 1057, 1061 (9th Cir. 1989) (conclusory allegations in affidavit not based on fact); Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 738 (9th Cir. 1979) (conclusory and speculative statements in affidavit not based on personal knowledge). This argument is without merit. The facts set out in Orsini's affidavit are neither in the form of legal conclusions nor speculative, but are material facts based on Orsini's personal recollection of the events. See generally 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure 2738 (3d ed. 1998). Rule 56 allows for the consideration of affidavits on summary judgment. Fed. R. Civ. P. 56. Finally, although in part Orsini recites statements of crew members, the crew members' statements in Orsini's affidavit are not hearsay because they are relevant to Orsini's state of mind and the effects those statements had on him, not the truth of the matters asserted. Fed. R. Evid. 801(c).
 
 
 [5]
 The first maintenance payment of $ 875 was not paid until October, nine months after the incident. Total maintenance was $ 2,650. Orsini estimates maintenance at $ 10,100 ($ 25/day for 404 days) based on his professed inability to work from January 28, 1998 to March 9, 1999.
 
 
 [6]
 The district court also concluded that Orsini explicitly signed away his rights in the case of misdiagnosis because the Release had a provision waiving rights to conditions unknown to Orsini at the time of signing. First, the Release here did not explicitly say that claims were released not-withstanding misdiagnosis; it merely released the vessel from any claims for past conduct predating the entry of the Release. Second and more importantly, under Garrett, even an express provision for misdiagnosis need not necessarily be given controlling weight because inaccurate medical advice is an express possibility against which Garrett is meant to protect. Under the circumstances of this case, where the seaman was unrepresented by counsel and did not receive a full and fair disclosure of legal rights from the vessel, the Release provision possibly allowing for misdiagnosis, in our view, cannot properly be given substantial weight in considering the factor of medical advice.
 
 
 [7]
 In Resner, we qualified the required level of advice by holding that the shipowner "was not obliged to explain the merits of his claim to [Resner] or send him to a lawyer." Resner, 83 F.3d at 274. We do not disagree with that holding. Seabrooke did not have to give Orsini an evaluation of the merits of his potential claims or provide him with a lawyer.
 
 
 [8]
 Seabrooke's reliance on Simpson v. Lykes Bros. Inc., 22 F.3d 601 (5th Cir. 1994), is misplaced. Seaman Simpson suffered a back injury in 1984 and signed a release in exchange for $ 398,000 five years later. Id. at 601. In 1992, Simpson sued under the Jones Act alleging hearing loss as a result of on-the-job exposure to excessive noise. Id. The court upheld the release, concluding that the sizable consideration and the fact that the release was the product of extensive consultations with his own attorney indicated that Simpson "was informed of his rights and of the consequences of signing the release." Id. at 602. Simpson is inapposite because the Release signed by Orsini was not a product of extensive deliberation with his counsel and it did not provide such substantial consideration.